UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| THE TORO COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>MATTHEW P. SMITH,<br>MICHAEL D. FLOYD,<br>R. JONES, BRENT A. MILLS,<br>CRAIG M. CONYER,<br>JAMES W. KEPNER,<br>STEEL GREEN<br>MANUFACTURING LLC,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 1:18-cv-03026-WTL-DLP |

# Declaration (SEALED)of Dr. James Rice for Pl.'s Mot. for Prelim. Inj.

Dated: December 26, 2018

Respectfully submitted,

FAEGRE BAKER DANIELS LLP

By: /s/ *Matthew E. Burkhart*
Matthew E. Burkhart (#31916-09)
300 North Meridian Street, Suite 2700
Indianapolis, IN 46204
Telephone: (317) 237-0300
Facsimile: (317) 237-1000
Matthew.Burkhart@FaegreBD.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| THE TORO COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>MATTHEW P. SMITH,<br>MICHAEL D. FLOYD,<br>R. SCOT JONES, BRENT A. MILLS,<br>CRAIG M. CONYER,<br>JAMES W. KEPNER,<br>STEEL GREEN<br>MANUFACTURING LLC,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 1:18-cv-03026-WTL-DLP |

**DECLARATION OF DR. JAMES RICE**

I, Dr. James Rice, hereby declare as follows:

## I. INTRODUCTION

1. I have been retained by Faegre Baker Daniels LLP on behalf of The Toro Company ("Toro") as a technical expert in this matter to provide my opinions in connection with the trade secret misappropriation allegations brought by Toro against defendants Matthew Smith, Michael Floyd, R. Scot Jones, Brent Mills, Craig Conyer, James Kepner (collectively "Individual Defendants"), and Steel Green Manufacturing LLC ("Steel Green"). I understand that Toro's allegations concern trade secrets it possesses regarding its manufacturing of stand-on sprayers/spreaders.

2. Specifically, I have been asked by Toro to provide expert testimony on whether (a) the information about Toro's manufacturing of stand-on sprayers/spreaders is generally known or readily ascertainable by proper means by others who can obtain economic value from

its disclosure or use; (b) the information produced in discovery by Defendants supports a 100-day development timeline as asserted by Defendants ("100-Day Development Timeline"); and (c) Steel Green or any of the Individual Defendants used Toro's trade secrets in its development or manufacture of Steel Green stand-on sprayers/spreaders.

3. I understand that, for Toro to have information that qualifies as a trade secret, that information must (a) not be generally known or readily ascertainable by proper means by others who can obtain economic value from its disclosure or use, and (b) the subject of reasonable efforts to protect its secrecy. I express no opinion on whether Toro took reasonable efforts to maintain the secrecy of its purported trade secrets, as that evaluation falls outside of my area of expertise. For purposes of this declaration, I assume that Toro has taken such reasonable efforts and evaluate whether the information it purports to have protected is generally known or readily ascertainable by proper means by others who can obtain economic value from its disclosure or use, as well as whether that information has been misappropriated by Steel Green and/or the individual defendants.

4. My opinions in this declaration are based on a review of a portion of the documentary evidence produced in this case, my own independent research and investigation, my education, and my professional experience, which includes more than 40 years of experience in industry and academia. A summary of my qualifications is provided below. As further described in this declaration, due to the expedited nature of this matter, I have not yet had sufficient time to review all documents that have been produced. I continue to review documents and reserve the right to supplement or augment my opinions based on my ongoing review, any additional discovery information that is produced or received, and any other information gleaned from my own review and investigation.

## II. BACKGROUND AND QUALIFICATIONS

5. I hold Bachelors, Masters, and Ph.D. degrees in Mechanical Engineering. I have over 40 years of professional experience in mechanical engineering design and analysis in both academic and industrial environments. I have worked as a consultant or advisor for over 50 companies, including Ford Motor Company, Boeing Aircraft, General Motors, and Siemens. I have authored or co-authored over 30 publications and numerous consulting reports.

6. I have extensive background and experience in the area of mechanical engineering design and analysis. In particular, I have extensive education, background, and experience in the fundamental technical areas of relevance to the design and engineering of mechanical equipment such as the stand-on spreaders/sprayers of the current study. A major portion of my professional experience has involved my direct participation in engineering projects involving the design and development of a wide variety of such mechanical systems and components.

7. Of particular relevance to the current study is my extensive experience in Computer Aided Engineering ("CAE"). CAE broadly includes Computer Aided Design ("CAD") software and Computer Aided Analysis software. I founded a software company that developed analysis software with the primary goal of providing the capability of working in conjunction with the CAE software available at the time. The software would allow a user to generate an analysis model directly from a CAD model. The software we developed was widely used in industry by companies such as Ford, Boeing, John Deere, and Caterpillar. In addition, during the academic portion of my career, I taught courses in "Computer Aided Engineering."

8. A current copy of my curriculum vitae setting forth further details of my background and relevant experience is attached as Exhibit 1. My curriculum vitae includes a listing of cases for which I have provided expert testimony over the last five years and a list of all

of the publications I have authored. I am being compensated at my usual rate of $400 per hour. My compensation is not dependent on the outcome of this litigation or the opinions I present in this report.

## III. MATERIALS CONSIDERED

9. To the best of my knowledge, I have been provided with access to every document that has been produced in this matter, including those documents produced by nonparties. I have not yet reviewed every document that has been produced in this matter, as I have not yet had enough time to do so given the expedited nature of the proceedings. As of December 21, 2018, I have reviewed only a portion of the produced documents, including some part drawings produced by both Toro, Steel Green, and the Individual Defendants. As stated previously, I continue to review documents and reserve the right to supplement or augment my opinions based on my ongoing review, any additional discovery information that is produced or received, and any other information gleaned from my own review and investigation.

## IV. OPINIONS AND THE BASES THEREOF

10. Based on my review completed to date, I have reached to following opinions.

### A. Toro Possesses Trade Secret Information.

11. Based on my review to date, my own independent research and investigation, my education, and my professional experience, it is my opinion that Toro's trade secrets are not generally known or readily ascertainable by proper means by others who can obtain economic value from their disclosure or use.

12. Specifically, as noted in Toro's responses to Steel Green's interrogatories, Toro contends that its trade secrets consist in part of engineering and computer-aided drawing (CAD) files for Toro's Z-Spray stand-on sprayer/spreader machines and the fixtures used in the

machines' manufacture, including but not limited to .ipt, .iam, .idw, .dwg, .dxf, .cnc, and .prt files.

13. It is my opinion that these drawings are not generally known or readily ascertainable by proper means.

14. Based on my investigation to date, I have found no instance where Toro published its engineering or computer-aided drawing files for the public to view. Moreover, the information contained within Toro's engineering and computer-aided drawing files is not readily ascertainable by proper means. Toro's engineering and computer-aided drawing files contain information that could not be obtained through a reverse-engineering process, such as manufacturing tolerances and other manufacturing information like assembly procedures. Some examples of Toro drawings containing this type of information include drawings for parts ZB200336 (listed as "Exhibit_A37756" in Exhibit 1 to Toro's interrogatory responses), ZB200144-A (listed as "Exhibit_A37348" in Exhibit 1 to Toro's interrogatory responses), ZB200354 (listed as "Exhibit_A37773" in Exhibit 1 to Toro's interrogatory responses), 80176-R (listed as "Exhibit_A37330" in Exhibit 1 to Toro's interrogatory responses), ZB200113 R1 (listed as "Exhibit_A37603" in Exhibit 1 to Toro's interrogatory responses), and 80154-2014 (listed as "Exhibit_A37571" in Exhibit 1 to Toro's interrogatory responses), just to name a few.

15. Furthermore, as noted in Toro's interrogatory responses, Toro also contends that its trade secrets consist in part of product component sourcing, including the identity of component suppliers, component costs, and Toro's proprietary compilation of vendor component drawings and offerings. It is my opinion that this information is also not generally known or readily ascertainable by proper means.

16. Based on my investigation to date, I have found no instance where Toro published its compiled vendor list or drawings for the public to view. Moreover, the information compiled by Toro with respect to its vendor drawings, sources, and offerings is not readily ascertainable by proper means. The full complement of Toro's vendor information could not be derived from a reverse-engineering process or other proper means.

### B. The Steel Green 100-Day Development Timeline Is Not Plausible Without the Use of Toro Trade Secret Information.

17. It is my opinion that the timeline in which Steel Green purports to have developed its products is implausible.

18. Specifically, Steel Green contends in its response to Toro's Interrogatory No. 3 that its development of its six prototype machines "started in mid-July 2018" and "were finished on or about October 15 and 16, 2018." I refer to this assertion as the "100-Day Development Timeline" in this declaration.

19. Based on my review to date, my own independent research and investigation, my education, and my professional experience, it is my opinion that Steel Green could not design, develop, and manufacture six prototypes of these types of machines within a period of approximately 100 days without the use of Toro trade secret information.

#### 1. The Product Development Process

20. The typical new product development cycle is illustrated below in Figure 1.

21. The design and engineering process for a product typically proceeds in a number of related and iterative steps as illustrated below in Figure 1. This process is greatly simplified in this figure and does not call out detailed design requirements such as the development of required manufacturing equipment and processes. Such steps are simply included as part of overall blocks such as the "Detailed Design" or "Design Modifications" steps shown in the figure. Input to each

of these steps may come from an engineering group, a manufacturing group, or a quality control group for example. Once the development process is essentially complete, all of the required information to manufacture the product is typically stored in a “Product Data Management” (PDM) database or some functionally-equivalent software or system. The data is accessed using the software or system specifically designed for this purpose. Note that the product is never static, but may evolve during its’ life cycle as improvements are developed.




Figure 1

In order to create working prototypes of these machines, at a minimum Steel Green would have had to complete all of the steps shown in the above figure for at least the "Detailed Design" portion of the cycle. To date, I have seen no evidence that Steel Green engaged in all of these steps in connection with the production of Steel Green's machines. The complexity of the Z-Spray machines further illustrates the implausibility of the 100-Day Development Timeline.

22. Based on my review to date, I have determined that Toro's Z-Spray Z-Max machine has 15 part assemblies, as listed in the table shown below. Each of those part assemblies is made up of several component parts, as also reflected in the table shown below. The smaller Z-Spray machines have a similar number of parts.

| **Assembly** | **Number of Parts** |
|---|---|
| Engine Assembly | 65 |
| Main Frame | 38 |
| Park Brake | 17 |
| Fuel System | 10 |
| Hydro Assembly | 65 |
| Motion Control Assembly | 36 |
| Spray Assembly | 62 |
| Manifold Assembly | 13 |
| Liquid Valve Assemblies | 13 |
| Boom Assembly | 20 |
| Left Tank & Hose Reel Assembly | 13 |
| Right Tank Assembly | 4 |
| Spreader Assembly | 47 |
| Wheel Assembly | 16 |
| Standard Electrical Assembly | 38 |
| **Total Required Parts** | **457** |

23. Each of these 457 required parts must be specified and either manufactured or sourced from an appropriate vendor. A drawing and/or specification would be required for each one of the parts. Based on my review to date, I do not see the type or amount of development that would be required of a manufacturer that is creating a new product from scratch.

### 2. The Inadequacy of the Drawings Reviewed to Date Further Illustrates the Implausibility of the 100-Day Development Timeline.

24. To date, I have reviewed several part drawings produced by Steel Green and the Individual Defendants.

25. A significant number of these drawings are wholly inadequate. While my review is not yet complete, many of the "drawings" that I have reviewed to date fail to include critical information that would be needed in order to manufacture prototype machines. Numerous drawings are missing key measurements, manufacturing tolerances, material specifications, surface finishes, titles, bend radiuses, or other manufacturing information such as assembly procedures, that I would expect to see on drawings that would be used to create machines and their components.

26. Based on my review of a portion of the documentary evidence produced in this case, my education, and my professional experience, it is my opinion that Steel Green could not develop complete, working prototypes of its machines using only the drawings that it has produced in this matter. As a result of the missing key measurements, manufacturing tolerances, material specifications, surface finishes, titles, bend radiuses, or other manufacturing information as described above, many of the drawings that I have reviewed present insufficient information for a manufacturer to actually make the part drawn, let alone full machines consisting of the hundreds of individual component parts.

### 3. Steel Green's Reliance on Known Toro Vendors Further Illustrates the Implausibility of the 100-Day Development Timeline.

27. As noted above, each of these 457 parts required to manufacture a Z-Spray-like machine must be specified and either manufactured or sourced from an appropriate vendor.

28. Based on the evidence that I have reviewed, it is my opinion that Steel Green relied on Toro confidential information to source components for its competing machines.

29. Specifically, I have reviewed two documents produced by the Individual Defendants that reflect vendor information. INDS00013245 appears to be a list of potential vendors compiled by one or more of the Individual Defendants in preparation for a planning meeting at Defendant Smith's house on May 21, 2018—a time at which the Individual Defendants were still working for Toro. INDS00000626 appears to be a list of vendors that Steel Green had contacted, which was transmitted by email INDS00000625 from Mike Floyd to Ray Riley on September 4, 2018. Additionally, I have reviewed a 2016 Toro vendor list, which was produced at Bates number TORO00018253.

30. Based on my review of these customer lists, there is significant overlap between the vendors Toro used as component sources for its Z-Spray line and the vendors that Steel Green has targeted and/or contacted for sourcing its machines. More specifically, I see over 20 vendors from the Toro vendor list that are present on one or both of the two Steel Green vendor lists described above.

31. Additionally, there are several communications that have been produced by the Individual Defendants that show Steel Green's reaching out to Toro vendors and requesting that those vendors source identical or near-identical Toro parts for Steel Green. *See, e.g.*, INDS00010220, INDS00011225, INDS00011229, INDS00011237, INDS00009594.

**C. Steel Green Misappropriated Toro's Trade Secret Information.**

32. As an initial matter, it is my understanding, based on my review of Toro's interrogatory responses, that the Individual Defendants had access to all of the confidential and trade secret information that is at issue here.

33. Additionally, my initial review of a portion of the produced documents suggests that the Individual Defendants were heavily involved in the creation of Toro's Z-Spray line. This

is particularly true of Defendant James Kepner, as the documents reflect that he was responsible for creating numerous drawings for Toro's Z-Spray machines

34. Furthermore, I also understand that the Individual Defendants have represented their intent that their "new" competing machines would replicate those made by Toro. For example, I am aware of document INDS00013266, which appears to indicate Steel Green's desire to create what would essentially be "twins" of the Junior and Intermediate Z-Spray machines, "less wheels and tub ring."

35. Finally, I understand that, upon their departure from Toro, the Individual Defendants collectively took over 80,000 Toro files, as admitted in the Individual Defendants' letter to Toro returning three removable storage devices containing those 80,000+ Toro files. *See* TORO00030877; Exhibit 1 to Toro's interrogatory responses.

36. Based on these facts, combined with the additional facts referenced above and my review to date, it is my opinion to a reasonable degree of engineering certainty that Steel Green used Toro's trade secret information.

37. While my review is ongoing, my preliminary review has revealed several Steel Green drawings that are substantially similar to drawings produced by Toro.

38. Furthermore, while my review is ongoing, it is my opinion that Steel Green used Toro's trade secret vendor information by targeting known Toro vendors, thus substantially reducing the time that would otherwise be needed for product development.

39. Once I have completed my review, I will supplement my opinions with additional information regarding Steel Green's use of Toro's drawing and vendor information.

## V. CONCLUSION

40. Based on a detailed review of a portion of the documentary evidence produced in this case, my own independent research and investigation, my education, and my professional experience, which includes more than 40 years of experience in industry and academia, it is my opinion to a reasonable degree of engineering certainty that (a) the information that Toro asserts is trade secret is not generally known or readily ascertainable; (b) the information produced in discovery by Defendants does not support its purported 100-Day Development Timeline; and (c) Steel Green, through the Individual Defendants, used Toro's trade secrets.

I declare under penalty of perjury under the laws of Indiana and the United States of America that the foregoing is true and correct. Executed this 26th day of December 2018, in Keswick, Virginia.

James Rice

Dr. James Rice